# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

NANCY I. TRINIDAD TORRES, on behalf of   *
her Minor child C.Y.R.T., who appears on   *
his own and as legal heir of Christopher Rojas   *
Miranda, et. al.   *    **CIVIL NO. 08-1415 (DRD)**
  *
    **Plaintiff,**   *
  *    **CIVIL RIGHTS**
    **v.**   *
  *
**HON. PEDRO TOLEDO-DAVILA, ET. AL,**   *
  *
    **Defendants.**   *
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE COURT:**

    **COME NOW** the Plaintiffs, by and through the undersigned attorneys, and submit the following Memorandum of Law in opposition to *Defendants' Motion for Summary Judgment and Memorandum of Law in Support Thereof* (Docket Entry 146).

## I.    INTRODUCTION

    This is a civil rights action for compensatory damages brought by Plaintiffs against three police officers who, under color of State law, subjected the deceased Christopher Rojas ("Rojas" or "decedent") to the deprivation of rights and privileges secured and protected by the Constitutions and laws of the United States and the Commonwealth of Puerto Rico, namely the Constitutional rights to be free from the use of excessive force and to be afforded medical attention for serious medical needs, which culminated in Rojas' death. The Plaintiffs also brings this claim against the then Superintendent of the Puerto Rico Police Department because his conduct reflected a reckless or callous indifference to the decedent's constitutional rights.

## II.     STATEMENT OF CONTESTED MATERIAL FACTS

Plaintiffs respectfully refer the Court to *Plaintiffs' Response To Defendants' "Statement of Uncontested Facts" and Statement of Additional Facts* and its supporting exhibits filed on this same date in a separate document pursuant to Local Rule 56.

## III.    MOTION FOR SUMMARY JUDGMENT STANDARD

Before granting a motion for summary judgment under Rule 56, the Court must find that there is "no genuine issue of material fact." *Anderson vs. Liberty Lobby Inc.*; 477 U.S., 242, 247-248 (1986). The facts must be viewed in the light most favorable to the non-moving party. *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgments cannot be sustained if "there existed any factual issues that needed to be resolved before the legal issues could be decided." *Rossy v. Roche Products Inc.*; 880 F.2d 621, 624 (1st Cir. 1989).

Rule 56, which sets forth the standard for ruling on summary judgment motions, provides that it shall not be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law. *Sands v. Ridefilm Corp.*, 212 F.3d 657 (1st Cir. 2000); *DeNovellis v. Shalala*, 124 F.3d 298 (1st Cir. 1997). A genuine issue of material fact exists, if there is sufficient evidence supporting the claimed factual disputes to require a trial. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746 (1st Cir. 1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. *Morrissey v. Boston Five Cents Savings Bank*, 54 F.3d 27 (1st Cir. 1995).

"In ruling on a Motion for Summary Judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's

favor.'" *Poulis-Minott v. Smith*, 388 F.3d 354, 361 (1st Cir. 2004). Courts should not engage in credibility assessments at the summary judgment stage. *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir. 2000). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Feliciano Roxon v. Ortho Biologics LLC*, 2005 WL 3418295 (D.P.R. 2005) ("There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record viewed in this manner, and without regard to credibility determinations, reveals no genuine issue as to any material fact, may the court enter summary judgment.").

An issue is "genuine" if it can "be resolved in favor of either party," and a fact is "material" if it "has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S.Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). Summary judgment is not appropriate where "the evidence on record is sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side." *Farmers Ins. Exch. V. RNK, Inc*., 632 F.3d 777, 782 (1st Cir. 2011) (internal quotation marks omitted).

## IV.    ARGUMENT

### A.    The Fourth Amendment Claims

Section 1983 grants citizens a private right of action against persons acting under color of state law for "the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *Camilo Robles v. Zapata,* 175 F.3d 41, 43 (1st Cir. 1999).  To state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege and prove the following elements: (1) that the conduct complained of was committed by a person acting under color of state law;

(2) that this conduct deprived plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States; and, (3) that the defendant was personally and directly involved in causing the violation of the plaintiff's federally protected rights. *Rodriguez-Vazquez v. Cintron-Rodriguez,* 160 F. Supp. 2d 204, 209-210 (D.P.R. 2001) (collecting Supreme Court and First Circuit cases). This third element requires a showing that the defendant's conduct was a cause of the alleged deprivation of the plaintiff's rights secured by the Constitution or federal laws. *Id.; see, also, Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 831 (1st Cir. 1987) ("Section 1983 imposes a causation requirement similar to that of ordinary tort law"). This may consist of direct acts by the defendant, certain acts performed at defendant's direction, or knowledge and consent. Each defendant individually responds for his own acts and omissions in the light of his own duties. *Rodriguez-Vazquez,* 160 F. Supp., at 210.

The Fourth Amendment to the U.S. Constitution guarantees individuals the right to be secure in their persons and houses against unreasonable searches and seizures of the person. U.S. CONST. Amend. IV; *see, Graham v. Connor,* 490 U.S. 386, 394 (1989). The Fourth Amendment Provides that:

> [1] The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [2] no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

The standard for assessing claims of excessive force during a search or seizure is well established in this circuit:

> To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer[s] employed force that was unreasonable under the circumstances. Whether the force used to effect a particular seizure is reasonable must be judged from the perspective of a reasonable officer on the

scene rather than with the 20/20 vision of hindsight. The reasonableness inquiry is objective, to be determined "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation. There must be careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Jennings v. Jones,* 499 F.3d 2, 11 (1st Cir. 2007) (quoting *Graham* 490 U.S., at 396-397) (citations and quotation marks omitted). Roja's Fourteenth Amendment violations are substantive in nature. A substantive due process violation is one in which officers take action that can "properly be characterized as . . . conscience shocking." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 (1998). The conscience-shocking standard provides relief where government officials have "abused [their] power, or employed it as an instrument of oppression." *Id.,* at 846, quoting *Collins v. City of Harker Heights,* 503 U.S. 115 (1992).

Furthermore, the due process clause of the Fourteenth Amendment requires the responsible governmental authorities to provide medical care to persons who have been injured while being apprehended by the police or who are exhibiting symptoms of diminished mental capacity at the time of arrest. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244 (1983); *Gaudreault v. Salem,* 923 F.2d 203, 208 (1st Cir. 1990); *Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir. 1991); *Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 560 (1st Cir. 1988).* Government officials violate this Constitutional requirement when they exhibit "deliberate indifference" to "serious medical needs," including "mental health and safety needs." *Montes v. Ponce Municipality,* 79 Fed. Appx. 448, 450 (1st Cir. 2003); *Gaudreault , 923 F.2d, at 208; Torraco,* 923 F.2d, at 234. "A 'serious' medical need is one diagnosed by a physician as mandating immediate treatment, or one that is 'so obvious' that a layman would 'easily' recognize the necessity for medical treatment." *Montes,* 79 Fed. Appx., at 450 quoting

*Gaudreault,* 923 F.2d, at 208. In order to establish deliberate indifference, "a plaintiff must establish that the officer was aware of a substantial risk of serious harm which he intentionally disregarded." *Turkowitz v. Town of Provincetown,* 914 F. Supp. 2d 62, 71 (D. Mass. 2012). Stated another way, the plaintiff must prove that officers "had a culpable state of mind and intended wantonly to inflict pain." *Barbosa v. Conlon,* 2013 U.S. Dist. LEXIS 81202 (D. Mass. 2013) (quoting *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir. 1991). "The requisite state of mind may be manifested by the official['s] response to [the plaintiff's] known needs or by denial, delay, or interference with prescribed health care." *Idem.*

There is no dispute that the Defendant police officers were acting under color of law. There are sufficient facts in the discovery record to establish that Rojas was deprived of his rights to be free of excessive use of force and to be provided medical attention for his serious needs. The factual history follows herein below.

### 1. Defendants' Deliberate Indifference to Rojas' Serious Medical Needs.

In 2003, Rojas began dating Ms. Nancy Trinidad ("Trinidad"). Their relationship blossomed; they moved in together and had a child, minor plaintiff CYRT, in 2006. *See, Plaintiffs' Response To "Defendants' Statement Of Uncontested Material Facts" And Statement Of Additional Facts Not Addressed By Defendants* (hereinafter "Plaintiffs' Facts")*, ¶* 117.

Rojas, on occasions over the last year before his death, used cocaine, perhaps twice a week. When he was high, Rojas became nervous with a sense of persecution and drove improperly; however, he was not violent. *Id., ¶¶* 120-121. On April 10, 2007, Rojas snorted cocaine. Trinidad saw Rojas that evening at about 6:00 p.m.; initially, he appeared to be "high". Rojas then went to take a shower and Trinidad was about to serve him dinner. By then, he looked fine: "he had already gotten over it." Before serving dinner, sometime between 7:00 to

7:30 p.m., Rojas stepped out of his house to buy refreshments. *Id.,* ¶¶ 122-123; Defendants' Statement of Uncontested Fact (Docket Entry 147), ¶ 2

At approximately 8:15 p.m., or shortly thereafter, Police Officers William Perez ("Perez") and Orlando Rivera ("Rivera ") first spotted Rojas and, subsequently, intervened with him. Deputy Perez stated that Rojas had run stoplights and was driving at a high speed, in an erratic manner and swerving. Plaintiffs' Facts, ¶ 124. Suddenly, Rojas brought his car to a halt in the area of State Road No. 2. *Id.,* ¶ 125.

After Deputy Perez got out of his car and proceeded to approach Rojas' vehicle, Perez noted that Rojas had maintained his hands on the steering wheel. Rojas was described as sweaty, nervous, and glancing in every direction. As Rojas turned towards Deputy Perez, he was instructed by Perez to shut the car's engine off and drop the keys outside of the car; step out of the car, move towards the rear of the car and place his hands on his car's trunk. Rojas obeyed Perez's commands. Perez asked Rojas if he was alright, if he had a problem or an emergency, or if they could provide assistance; but Rojas did not answer Officer Perez's inquiry. At all times, Rojas maintained his hands on the trunk of the car. Deputy Perez, again, inquired with Rojas regarding his condition; however, Rojas would not respond. Rojas then started looking in a fixed manner towards State Road No. 2. Precipitously, he started screaming, "Why is that vehicle following me, why is it following me." *Id.,* ¶¶ 127-130. Deputy Perez described Rojas at that moment as if he had exploded. Rojas was wild-eyed and the veins in the temple region were bulging. Rojas kept saying that he was being followed and that someone was trying to kill him, with his gaze fixed on Highway No. 2. Up to this point in time, Rojas was agitated more than anything else; but Rojas stayed where he was and did not lift his hands from the trunk of the car. *Id.,* ¶¶ 131-132, 134.

Throughout the intervention Deputy Perez had been asking and kept asking Rojas if he was alright, if he had any problem; Rojas did not answer him and simply kept repeating "…*they are going to kill me, they are following me…"*. In fact, Deputy Perez described him as looking "wild-eyed." Plaintiffs' Facts, ¶ 136. Rojas then began yelling obscenities and foul language. Deputy Perez testified that he was not sure to whom Rojas was directing the foul language. *Id.,* ¶ 133. At this point in time, Officer Perez made a judgment call to restrain Rojas, and reached for his handcuffs. Suddenly, Rojas gyrated and impacted Officer Rivera's portable radio, knocking it out his hands. However, Deputy Perez testified that this incident was not intentional; Rojas did not have intent to assault them. *Id.,* ¶ 135. A scuffle ensued between the two officers and Rojas. All three went to the ground and Rojas hit the ground with his chest or stomach. By the time that he was restrained -- after they hit the ground -- and handcuffed, Rojas had no injuries or bruises on him. *Id.,* ¶¶ 137-139.

Officer Perez described Rojas' demeanor as very sweaty and disoriented, and exhibiting a pale or sickly complexion. He was "out of himself" and "screaming in an incoherent manner." Deputy Perez could not determine to whom Rojas was directing his rant and Rojas would simply not respond to any of Perez's inquiries. Rojas kept up the rant that he was being followed and someone wanted to kill him, looking nervously in every direction. In fact, Deputy Perez stated that, by Rojas' words, Rojas was "incoherent." Similarly, Rivera described Rojas as looking "pale … anxious … [and] incoherent." *Id.,* ¶¶ 141-143.

When Sergeant Miguel Rodriguez ("Rodriguez") arrived at the scene, Rojas was already handcuffed and in the patrol car. Rojas was screaming foul language and yelling that he was being followed and that he was going to be murdered. Rodriguez looked inside the patrol vehicle and saw that Rojas was sweating; his verbal expressions were incoherent. *Id.,* ¶ 144.

Sergeant Rodriguez instructed Deputies Rivera and Perez to take Rojas to a medical facility to receive treatment for his diminished mental capacity. However, Rodriguez allowed Rivera and Perez to override his order to take Rojas to a medical facility, thereby, essentially, allowing the officers to make a medical judgment call. Instead, they took Rojas to the police station. *Id.,* ¶¶ 140, 145.

On the basis of the facts narrated above, Mr. Lou Reiter, an expert consultant in police practices, rendered the following opinions regarding the deliberate indifference to the decedent's urgent medical needs displayed by Rodriguez, Rivera and Perez:

> Officers Perez and Rivera and Sgt. Rodriguez all have stated that Mr. Rojas was exhibiting symptoms of a person of diminished capacity. Officer Perez stated that Mr. Rojas at the scene "was extremely sweaty, disoriented and bug-eyed" and continuously insisting that he was being followed by "a big black bus" and "wanted to kill him." Officer Rivera stated similar observations and that his "face was extremely pale, his lips were very black." Sgt. Rodriguez stated similar observations and ordered the officers to take Mr. Rojas to the hospital. The officers, contrary to this order from their supervisor, took Mr. Rojas to the police station and there had to also shackle his feet.
>
> Once a subject is controlled and taken into police custody, the subject becomes the ultimate responsibility of the officers and any other sworn member of the Police Department who has knowledge of the subject's condition. This is a common and generally accepted police practice. . . . In the field of prisoner transportation, there are few issues of greater interest for judicial oversight than the well-being of prisoners in custody.
>
> Officers Perez and Rivera made a conscious choice to ignore this essential prisoner well-being provision and disregard the direct order from their supervisor, Sgt. Rodriguez. Of course, Sgt. Rodriguez cannot escape accountability for allowing the officers to ignore his order to take Mr. Rojas to the hospital. Of top of these deliberately indifferent decisions, the officers took Mr. Rojas and further restrained him by shackling his legs. It was only when the officers noticed that Mr. Rojas was now in severe medical distress did they summon medical assistance. This delay was their choice and an indication of their deliberate indifference to Mr. Rojas' safety and well-being.

*Id.,* ¶¶ 158.

It is plain that the officers were responsible for Roja's safety and well-being. *See, DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.,* 489 U.S. 189, 199-200, (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). The evidence here clearly establishes that Rodriguez, Rivera and Perez committed "acts or omissions . . . sufficiently harmful to evidence deliberate indifference to [Roja's] serious medical needs." *Leavitt v. Corr. Med. Servs.,* 645 F.3d 484, 497 (1st Cir. 2011). The police officers were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed.]" *Id.* Rodriguez, in fact, drew such inference when he ordered Rivera and Perez to take Rojas to a medical facility. The police officers' decision to deny Rojas medical care for his urgent mental needs was made with "actual knowledge of impending harm, easily preventable." *Id.* Therefore, Plaintiffs have established an actionable Fourth Amendment claim for deliberate indifference to the decedent's serious medical needs.

### 2. Rojas Was Victim of the Use of Excessive Force.

Once arrested, Rojas was transported by Officers Perez and Rivera to the police station. Shortly after Perez and Rivera made it to the station, Sgt. Rodriguez arrived as well. Once in the precinct, Sgt. Rodriguez ordered all of the other police offers out of the station; remaining only the three defendants and a desk attendant. Rojas was placed in a holding cell, where he remained cuffed at the wrists and was also tied at the ankles. He was fully restrained. Sgt. Rodriguez and Officers Perez and Rivera were the last persons to see Rojas alive. The next persons who would see Rojas were paramedics who found his lifeless body in the holding cell and reported that he had no vital signs. Plaintiffs' Facts ¶¶ 146-149.

Protocol requires that the District Attorney's office, forensic science and the Police Homicide division be contacted in such cases. Upon being contacted, these officials arrived at the police station, immediately took charge of the scene and interviewed Perez and Rodriguez. *Id.,* ¶ 150. Shortly thereafter, Homicide Police Officer of the Puerto Rico Police Department, Braulio Gonzalez[1], arrived at the police station where Christopher Rojas had been transported to and subsequently died. Officer Gonzalez's "Incident Report" provided as follows:

> As a sign of violence [the decedent] had a laceration in the lower left part of his back. His right eyebrow had a laceration and an injury in the area of the chin. He had marks on his wrists and both knees were lacerated and he had a small cut on his left eyebrow.

*Id.,* ¶ 151. Moreover, photographs taken by the Forensic Science Institute show that Rojas was severely beaten. *Id.,* ¶ 152.

An expert consultant in anatomic pathology and forensic pathology, Dr. Adele Shaker, reviewed Christopher Rojas' case file. On basis of his twenty-five plus years of experience, training, education and knowledge in forensic pathology, Dr. Shaker rendered a report[2] in this case. *Id.,* ¶ 160. Dr. Shaker made the following findings in his expert report:

> **Blunt force trauma to head, face, trunk, and extremities**:
>
> There are multiple lacerations on the nose, left upper eyelid, mandibular chin, and left wrist. Extensive contusions involved on the right zygomatic arch, left cheek, right shoulder, both right and left knee, right arm, and both wrists. Numerous geographically distributed abrasions and contused abrasion are located over the right side of the face, dorsal aspect of both hands, both knees, right shoulder, left leg, and left lower back.

---

[1] Defendants asseverate that Jose Concepcion was the assigned homicide investigator. Docket Entry 146, at pp. 17-

[2] Defendants attempt to controvert Dr. Shaker's expert report with two documents: one, an *ex post facto* expert report first submitted in the summary judgment stage, wherein the occurrence pathologist (Edda Rodriguez) belatedly re-wrote her autopsy report; and, the other, a toxicology report by a psychiatrist (Raul Lopez) who was never announced as an expert witness and whose report failed to comply with Fed. R. Civ. P. 26 requirements. Docket Entry 146, at pp. 23-24. Plaintiffs contested the admissibility of these documents and, to that end, incorporate by reference herein their "*Motion In Limine to Exclude Dr. Raul Lopez and New Opinions Rendered by Dr. Edda Luz-Rodriguez.*" Docket Entry 155.

Some of the patterned injuries especially the left and right wrists are consistent with handcuffs. The right shoulder contused abrasions are consistent stomping injuries with imprint a shoe sole. The lower third of the right and left leg contused abrasions are consistent with patterned shackles.

Extensive contusions of the anterior muscles of the neck are noticed accentuated on the left side.

The wedge shaped hemorrhagic infarcted area of the upper lobe of the left lung and the hemorrhages surrounding the right 7th and 8th intercostal spaces are consistent with marked blunt force injuries to the chest.

The subarachnoid hemorrhages on the left parietal and occipital cerebral hemispheres accentuated on the lateral and medial aspects of the left parietal lobe and the contusions of the cerebellum are consistent with coup and contrecoup injuries due to markedly severe blunt force trauma to the head.

Examination of the brain revealed obliterated sulci and expanded gyri consistent with marked global cerebral edema. The medulla oblongata revealed an area of hemorrhages consistent with possible tonsillar herniation. Right tentorial (uncal) herniation is noticed.

*Id.,* ¶ 161.

Dr. Shaker concluded as follows:

The constellation of the above mentioned blunt force injuries of the deceased Mr. Christopher Rojas Miranda with the fatal subarachnoid hemorrhage and brain herniation are due to extensive non-accidental inflicted trauma to his body while he was constrained by handcuffs and shackles in police custody.

I state with a reasonable medical certainty that Mr. Christopher Rojas Miranda died from extensive blunt force trauma to the head and trunk.

*Id.,* ¶ 162.

The autopsy report stated as the cause of death body trauma and cocaine intoxication.

For manner of death, the autopsy report concluded that it was an "accident." On this point,

regarding the cocaine as cause of death, Dr. Shaker concluded that the autopsy report contained a series of fallacies as follows:

1) The collected blood sample is unknown whether from peripheral or central blood (heart) as the potential of postmortem redistribution should be put into consideration to reflect the actual and true level of cocaine before death.

2) The half-life of cocaine is thirty to ninety minutes and the parent drug could not be found in the blood analysis after that time. Cocaine also continues to be metabolized even after death. If Mr. Christopher Rojas Miranda died several hours after arrest in the police custody, his blood would not have revealed the parent drug cocaine, but only its metabolites. The validity and credibility of the toxicological analysis is questionable and should be reevaluated if the blood sample is still available.

*Id.,* ¶¶ 163-164.

Moreover, Mr. Lou Reiter, expert consultant in police practices, arrived at the following conclusions in relation with the use of excessive and deadly force:

**The injuries suffered by Mr. Rojas as depicted in the autopsy and medical expert report would constitute, in my opinion based upon my specialized skills, knowledge and training, a use of force contrary to generally accepted police practices and excessive for the circumstances described by the arresting officers. The failure to provide immediate medical care to someone whom the officers and supervisor acknowledge was exhibiting symptoms of a person of diminished capacity was a conscious choice and demonstrated deliberate indifference by all of the sworn members involved in this arrest. The Puerto Rico Police Department has continuously and historically chosen to not control, oversee or supervisor field officers' uses of force and allegations of police misconduct.**

*Id.,* ¶ 157.

The circumstantial evidence set forth above overwhelmingly establishes that the Police Officer Defendants employed force that was excessive and unreasonable under the circumstances after Rojas's arrest and which led to his lingering death in the holding cell. *See, Jennings v. Jones,* 499 F.3d, at 11. Segarra, therefore, has a viable claim for an unreasonable seizure and the use of excessive force under the Fourth Amendment.

### 3. Supervisory Liability.

In the context of Section 1983 actions, supervisory liability typically arises in one of two ways: either the supervisor may be a "primary violator or direct participant in the rights violating incident," or liability may attach "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999). The relevant inquiry is "whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort." *Id.* In either case, the plaintiff in a Section 1983 action must show an "affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" between the actor and the underlying violation. *Id.; see, also, Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989) (The causal connection alluded to by Sect. 1983 "can be established not only by some kind of [] personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."); *Springer v. Seaman*, 821 F.2d 871, 876 (1st Cir. 1987) (An actor is responsible for "those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.").

Perez entered the Puerto Rico Police Department in the year 1993. His training at the police academy lasted between seven to eight months. While at the academy, Perez was trained in the subjects of criminal law, civil rights, criminology, physical training, criminal procedure, the criminal code, evidence and use of force during an arrest. Plaintiffs' Facts ¶¶ 153-154. After Officer William Perez left the academy and up to April 2007, when the intervention with Christopher Rojas occurred, Perez had not received any training. *Id.,* ¶ 155.

Mr. Lou Reiter, expert consultant in police practices, reviewed the pleadings, reports and discovery exchanged by the parties in the pre-trial proceedings. On basis of his fifty plus years of experience, training, education and knowledge in police practices and law enforcement, he rendered the following opinions concerning supervisory practices and Superintendent Pedro Toledo's ("Toledo") failure to supervise:

> In numerous civil cases that I have been involved in concerning members of the Puerto Rico State Police, the issue of use of force has been a specific element of the case. In one such case I opined [] that the supervisory control procedures for officers' use of force was extremely deficient and evidenced a deliberate indifference on the part of supervisors, managers, command officers and the Superintendent.

> This similar supervisory deficiency was addressed in a recent case in which I was deposed involving the use of force involved in a shooting death by members of the Puerto Rico Police Department. *Ramirez-Lluveras, et al., v. Pagan-Cruz, et al.* Civil No. 08-1486 RLA. In this case Superintendent Toledo, by interrogatory answer and deposition, acknowledged that the Police Department had no statistical information regarding uses of force including deadly force.

> The consequence of not having these common and generally accepted supervisory oversight tools in place is that field officers learn that their uses of force will not be scrutinized and they will not be held accountable for improper and/or excessive uses of force.

> In this matter Officers Perez and Rivera and Sgt. Rodriguez all deny that any unreasonable use of force was used. The investigative follow-up was perfunctory and consistent with my understanding of similar investigations in the past. This failure by the Police Department would have been known to officers, such as Perez and Rivera and Sgt. Rodriguez. Their denials are simply accepted without question or challenge with the medical evidence.

> Officers Perez and Rivera and Sgt. Rodriguez have had prior citizen complaints alleging improper use of force, verbal assault and fabrication of evidence. Officer Perez record shows 9 complaint investigations including a 60 day suspension for "immoral conduct" where he gave theft evidence taken from suspects to himself and others; 2 negligence during investigations; and an assault. The cases from 2002 and 2006 are still pending disposition. Sgt. Rodriguez' record discloses 8 complaint investigations between 1999 and 2009; 4 since 2005 are still pending

disposition. Officer Rivera's record indicates 3 complaint investigations between 2002 and 2007.

In all of the cases I have been involved as an expert police practices expert involving members of the Puerto Rico Police Department, dating back into the late 1970s, th[e] essential supervisory control system of investigating citizen complaints and other information regarding alleged police officer misconduct has been consistently and deliberately been handled by supervisors, managers and superintendents in a severely deficient manner. These supervisors, including Superintendent Toledo, have not even followed their own agency's written protocols. Supervisors continue to not follow the provisions of the General Order issued in 1987 that required them to access and become familiar with the complaint and disciplinary history of all personnel under their command.

Superintendent Toledo, in his answers to interrogatories, stated that there are written orders and training for officers to "handle suspects which present possible mental instability or might be suicide risk … constant vigilance and watch over the suspect is also instructed until proper medical personnel can take over the situation." These documents have not to my understanding been produced and, of course, none of the officers involved directly with Mr. Rojas functioned in this capacity to provide reasonable care for his well being.

*Id.,* ¶¶ 156, 159.

It is uncontroverted that since the field police officers left the policy academy they had not received additional continuing education. Further, as addressed by Lou Reiter, the Puerto Rico Police Department did not have an articulated protocol addressing situations dealing with individuals with diminished capacities. Moreover, Mr. Reiter noted that the officers' disciplinary records had sufficient indicia of behavioral problems; however, the agency was remiss in addressing the same. Therefore, Plaintiffs have established an actionable Fourth Amendment claim for supervisory liability against Toledo.

**B.  Rojas' Fourth Amendment Rights Were Clearly Established Where a Reasonable Official Should Have Known that Denying Medical Treatment to Serious Medical Needs and Using Deadly Force Would Violate His Rights**

Qualified immunity is a defense where government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person should have known.  *See*, *Harlow v. Fitzgerald,* 457 U.S. 800 (1982); *Surprenant v. Rivas*, 424, F. 3d 5 (1st Cir. 2005).  Additionally, qualified immunity "provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 - or *Bivens* herein - for infringing the constitutional rights of private parties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  As a general rule "the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was 'apparent' when undertaken". *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).  Through the medium of qualified immunity, the law strives to balance its desire to compensate those whose rights are infringed by government actors with a desire to shield public servants from undue interference with the performance of their duties.  *Buenrostro v. Collazo*, 973 F.2d 39, 42 (1st Cir. 1992).

In *Pearson v. Callahan*, 129 S. Ct. 808 (2009), the Supreme Court altered the qualified immunity inquiry into a two-part test.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. *Id.* at pp. 815-16. The second step of the qualified immunity analysis has two aspects.  *Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009).  One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation.  *Id, at* 269.

To overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That is whether existing case law gave the defendants "fair warning that their conduct violated the plaintiff's constitutional rights." *Suboh v. Dist. Attorney's Office of Suffolk*, 298 F.3d 81, 93 (1st Cir. 2002). In other words, the law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct" at issue. *United States v. Lanier*, 520 U.S. 259, 271 (1997).

By the time of the constitutional violations, Rojas' Fourth Amendment rights were clearly established in this circuit. *Torraco,* 923 F.2d, at 234 (1st Cir. 1991); *Jennings,* 499 F.3d, at 11 (1st Cir. 2007). At the time of the arrest, by Defendants' own admissions, Rojas was incoherent and exhibiting bizarre behavior to the point were Sgt. Rodriguez became concerned about his health and ordered for Rojas to be transported to medical facility. Instead, Rojas was taken to the precinct. Prior to arriving at the precinct, he had no markings or evidence of bruising. Rojas was fully restrained -- handcuffed and shackled by the ankles – and placed in a holding cell. There, he received a severe beating which caused his death.

The other aspect of the defense focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. *Maldonado, supra.* Indeed, "[i]t is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004). Cognizant of both the contours of the allegedly infringed right and the particular facts of the case, "[t]he relevant,

dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*, at 199. That is, the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional. *See, Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[A] plaintiff need not present an identical case to show that the law was clearly established; instead, a plaintiff must only show that the 'contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1241 (10th Cir. 1999), quoting *Anderson,* 483 U.S., at 640. The Supreme Court has explained that

> general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

*United States v. Lanier,* 520 U.S. 259, 71, 117 S. Ct. 1219, 137 L.Ed.2d 432 (1997).

When the conduct at issue is such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force, a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful. *Jennings*, 479 F.3d, at 125.

Herein, the Defendant Police Officers were on notice that they had to provide medical care for the serious mental health and safety needs to individuals under police custody and that they could not use deadly force when such individuals were restrained and presented no threat whatsoever. In fact, the supervisor, Sgt. Rodriguez, noting that Rojas was in dire need of medical assistance, ordered the lower ranking officers to take him to a hospital for medical attention, and then he egregiously allowed them to veto his order and to succumb to their primeval desires. Simply put, it was patently clear for the Defendant Police Officers that they could not wantonly beat Rojas to the point of killing him.

### C.     Supplemental Jurisdiction

Article 1802, the general tort statute of the Commonwealth provides "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done.  Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity."  31 LPRA §§ 5141.  Under Article 1802 recovery of tort damages requires a showing that the defendant "by act or omission cause[d] damage to another through fault or negligence." P.R. Laws Ann. tit. 31 § 5141. The three essential elements for general tort claims are: (1) evidence of physical or emotional injury, (2) a negligent or intentional act or omission (the breach of duty element), and (3) a sufficient causal nexus between the injury and defendant's act or omission (in other words, proximate cause). *Vazquez-Filippetti v. Banco Popular de PR*, 504 F.3d 43, 49 (1st Cir. 2007) (citing *Cintrón-Adorno v. Gómez,* 147 D.P.R. 576, 598-99 (1999)).

The tort of intentional infliction of emotional distress exists when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Santiago-Ramirez v. Secretary of Dep't of Defense,* 62 F.3d 445, 448 (1st Cir. 1995), quoting the Restatement (Second) of Torts § 46 (1965). "Hence, in order to adequately plead h[is] claim plaintiff must show that defendants' conduct was extreme and outrageous, intentional or reckless and that []he suffered severe emotional distress as a result thereof." *Vazquez v. Am. Home Prods. Corp.,* 2006 U.S. Dist. LEXIS 15698 (D.P.R. 2006).

Undoubtedly, in wrongfully denying Rojas medicak attention for his urgent medical needds and, instead, subjecting him to a brutal beating and leaving hm in a cell to suffer a lingering death, Perez, Rivera and Rodriguez engaged in intentional or reckless conduct which was extreme and outrageous.  As result of such conduct, Plaintiff suffered extreme emotional

distress and the aprehension of his iminent death.  Therefore, Plaintiffs have establishd a claim for intentional infliction of emotional distress.

Furthermore, Article 1803 recovery under the doctrine of *respondeat superior* consistent with Puerto Rico law of tort damages requires a showing that the employee's acts "fall within the scope of his employment in the sense that they furthered a desire to serve and benefit the employer's interest." *Borrego v. United States* 790 F.2d 5, 7 (1st Cir.1986) (citing *Martínez v. Comunidad Mateo Fajardo,* 90 D.P.R. 461, 1964 WL 14313 (1964); *Lloréns v. Lozada,* 73 D.P.R. 271, 1952 WL 8040 (1952)); *see also Meléndez-Colón v. United States Dep't of the Navy,* 56 F.Supp.2d 147, 151 (D.P.R.1999) (citing to rule in *Borrego*); *Vernet v. Serrano-Torres*, 566 F.3d 254, 260 (1st Cir. 2009).  "To consider the act to be within the scope of his employment, it should be the kind of act that the employee would be called upon to perform in his job, and it should have occurred during a period not unreasonably disconnected with the period of employment, and in a place not unreasonably distant from the place of employment, and ***motivated, at least in part, with the purpose*** of serving his employer." *Attallah v. United States,* 955 F.2d 776, 781 (1st Cir. 1992) (quoting *Obdulia Rivera v. Maldonado,* 72 D.P.R. 479, at 484 (P.R. 1951)).  The Puerto Rico Supreme Court expanded this standard in *Perez Rodriguez v. Sauri*, 84 D.P.R. 500 (1962), stating that "in order for liability to lie on the part of the employer, regardless of whether the employee's actions were against the employer's instructions or exceeded the duties of his employment, said act must have had the intention of benefitting the employer or forwarding his/her interests." *Attallah,* 955 F.2d, at 781 (quoting *Perez Rodriguez,* 84 D.P.R., at 503-04).  Moreover, the Supreme Court has ruled that "an employer is not liable for the wrongful criminal and intentional acts of an employee, unless this conduct is due somehow to the employee's desire to serve, benefit or further his employer's business or interest." *Attallah,*

955 F.2d, at 781-82 (quoting *Jimenez v. The People of Puerto Rico,* 83 D.P.R. 195, 200-01 (1961). According to the Court in *Jimenez,* "the test of liability is whether notwithstanding the fact that it is a question of wrongful conduct, the act performed is reasonably related to the scope of the employment, or if the agent has been prompted by purely personal motives." *Attallah,* 955 F.2d, at 782 (quoting *Jimenez* 83 D.P.R., at 201). Essentially, there must be some link between the intentional criminal act committed by the employee, and the legitimate interests of the employer. *Attallah,* 955 F.2d, at 782.

When determining whether or not an employee acted within the scope of his/her employment, the following elements must be evaluated: "a) [d]esire to serve, benefit, or further his employer's business or interest [; ] b) [whether] the act is reasonably related to the scope of the employment [; and] c) [whether] the agent has not been prompted by purely personal motives." *Borrego,* 790 F.2d 5, 7 (1st Cir. 1986) (quoting *Rodriguez v. United States*, 328 F. Supp. 1389, 1391 (1971)).

The conduct of the field police officers at issue in the instant case fell within the scope of the actors' employment since all three elements of the standard are present herein. The subordinates' actions were related to their employment and intended to benefit and forward the interests of their superior. Accordingly, Toledo can be held liable for the acts of their agents under Article 1803.

**WHEREFORE,** Plaintiffs respectfully requests this Court to deny Defendants' Motion for Summary Judgment.

**RESPECTFULLY SUBMITTED**. In San Juan, Puerto Rico, this 20th day of September 2013.

| | |
|---|---|
| s/Pedro R. Vazquez | S/José F. Quetglas Jordán |
| | |
| Pedro R. Vázquez | USDC-PR #203411 |
| USDC No. 216311 | **QUETGLAS LAW OFFICES** |
| PMB No. 153 | P.O. Box 16606 |
| Esmeralda Ave, Suite 2 | San Juan PR 00908-6606 |
| Guaynabo, PR 00969-4457 | Tel:(787)722-0635/(787)722-7745 |
| Phone (787) 722-0635 | Fax: (787)725-3970 |
| prvazquez@hotmail.com | jfquetglas@gmail.com |